No Repaid
#4

IN THE UNITED STATES DISTRICT COURT
For The
WESTERN DISTRICT OF PENNSYLVANIA

ANGEL RIVERA, a.k.a., KAHSAI ASAFO,   :   CIVIL ACTION No. 1:24-CV-313
            Plaintiff.                :
                                      :   DISTRICT JUDGE Lanzillo
        V.                            :
                                      :   JURY TRIAL DEMANDED
LAUREL HARRY, Secretary of The        :
Pennsylvania Department of Corrections :
TABB BICKLE, Executive Deputy         :
Secretary of Institutions;            :
TAMMY FERGUSON, Executive Deputy      :
Secretary of Institutions;            :
ROBERT MARSH, Regional Deputy         :
Secretary;                            :
CYNTHIA WRIGHT, Regional Chief        :
Licensed Psychologist Manager;        :
BRUCE SIMONS, Licensed                :
Psychologist Manager;                 :
R. IRWIN, Superintendant;             :
E. MONGELLUZZO, DSFM;                 :
M. BLICHA, DSCS/DSFM;                 :
I. GUSTAFSON, CCPM/DSCS;              :
J. ALEXANDER, Major,                  :
                Defendants.           :

RECEIVED

NOV 1 2 2024

CLERK, U.S. DISTRICT COURT
FOR THE WESTERN DISTRICT
OF PENNSYLVANIA

## COMPLAINT

Plaintiff, Angel Rivera, a.k.a., Kahsai Asafo, *Pro Se*, hereby submits this § 1983 civil action complaint this _____, day of _____, 2024 to the United States District Court for the Western District of Pennsylvania.

## I. JURISDICTION AND VENUE

1.      This is a civil action authorized by Section 42 U.S.C. § 1983 to redress the deprivation, under color of state law, of rights secured by the constitution of the United States of America. This court has jurisdiction over this matter under 28 U.S.C. Sections § 1331, and § 1334(a)(3), and (4).

2.      This court further has Supplemental Jurisdiction over this here matter under 28 U.S.C. Section § 1367.

3.      Plaintiff, Angel Rivera, seeks Declaratory Relief pursuant to 28 U.S.C. Section §

2201, and § 2202.

4.      Plaintiff's claims for Injunctive Relief are authorized by 28 U.S.C. Section § 2283, and § 2284, as well as Rule 65 of the Federal Rules of Civil Procedure.

5.      Venue properly lies in this district (Western District of Pennsylvania) pursuant to 28 U.S.C. Section 1391(b)(2), because events giving rise to this cause of action occured at the State Correctional Institution (SCI) Forest located at 286 Woodlnd Drive Marienville, Pennsylvania which is located in the Western District of Pennsylvania.

## II.   PARTIES INVOLVED:

6.      Plaintiff, ANGEL RIVERA, a.k.a., KAHSAI ASAFO, is and was at all times mentioned herein an individual incarcerated within the Pennsylvania Department of Corrections. However, Plaintiff currently resides and/or is confined at the State Correctional Institution (SCI) Phoenix located at 1200 Mokychic Drive Collegeville Pennsylvania 19426.

7.      Defendant LAUREL HARRY, Secretary of the Pennsylvania Department of Corrections, was at all times mentioned *The Secretary of the Pennsylvania Department of Corrections* whoms head office was and is located at the Pennsylvania Department of Corrections 1920 Technology Parkway Mechanicsburg Pennsylvania 17050.

8.      Defendant TABB BICKLE, Executive Deputy Secretary of Institutions (EDSI), was at all times mentioned a *Executive Deputy Secretary of Institutions of the Pennsylvania Department of Corrections* whoms head office was and is located at the Pennsylvania Department of Corrections 1920 Technology Parkway Mechanicsburg Pennsylvania 17050.

9.      Defendant TAMMY FERGUSON, Executive Deputy Secretary of Institutions (EDSI), was at all times mentioned a *Executive Deputy Secretary of Institutions of the Pennsylvania Department of Corrections* whoms head office was and is located at the Pennsylvania Department of Corrections 1920 Technology Parkway Mechanicsburg Pennsylvania 17050.

10.     Defendant ROBERT MARSH, Regional Deputy Secretary (RDS), was at all times mentioned a *Regional Deputy Secretary (RDS) within the Pennsylvania Department of Corrections* whoms head office was and is located at the Pennsylvania Department of Corrections 1920 Technology Parkway Mechanicsburg Pennsylvania 17050.

11.     Defendant CYNTHIA WRIGHT, Regional Chief Licensed Psychologist Manager, was at all times mentioned a *Regional Chief Licensed Psychologist Manager within the Pennsylvania Department of Corrections* whoms head office was located at the Pennsylvania Department of Corrections 1920 Technology Parkway Mechanicsburg Pennsylvania 17050.

12. Defendant BRUCE SIMONS, Licenensed Psychologist Manager (LPM), was at all times mentioned herein the *Licensed Psychologist Manager (LPM) at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

13. Defendant R. IRWIN, Superintendant, was at all times mentioned herein the *Superintendant at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

14. Defendant E. MONGELLUZO, DSFM, was at all times mentioned herein the *Deputy Superintendant of Facility Management (DSFM) at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

15. Defendant M. BLICHA, DSCS / DSFM, was at all times mentioned herein the *Deputy Superintendant of Centralized Services and/or the Deputy Superintendant of Facility Management (DSFM) at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

16. Defendant I. GUSTAFSON, CCPM / DSCS, was at all times mentioned herein the *Corrections Classification Program Manager (CCPM), and/or the Deputy Superintendant of Centralized Services (DSCS) at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

17. Defendant J. ALEXANDER, Major was at all times mentioned herein a *Major at the State Correctional Institution (SCI) Forest* located at 286 Woodland Drive Marienville Pennsylvania.

WHEREFORE, Plaintiff Angel Rivera brings the foregoing claims against *each individual* defendant listed above in paragraphs seven (7) through seventeen (17) in their *individual capacities*, and *official capacities...*

## III. PREVIOUS LAWSUITS FILED BY PLAINTIFF



18. Plaintiff currently has several civil actions pending before the court, but none of which have been filed in this here district, and or none of which he has filed regarding the forgoing matters...

## IV. THE FACTS

19. The Pennsylvania Department of Corrections (Pa. DOC) practices the use of solitary confinement in a multitude of variations. The most common forms of solitary confinement are disguised under statuses such as Disciplinary Custody Status (DC),

Administrative Custody Status (AC), and The Restricted Release List (RRL).

20.    Individuals restricted to these statuses are thereby subjected to confinement within one of the multitude of solitary confinement units utilized by the Pennsylvania Department of Corrections (Pa. DOC). These units are OFFICIALLY called "Security Level 5 Housing Units" by the Pennsylvania Department of Corrections (Pa. DOC), and are commonly referred to as follows:

(1).    The Restricted Housing Unit (RHU), which is still in use as of date and is commonly used to house individuals on AC status, DC status or The Restricted Release List. This unit is specifically designed to house those on the above mentioned statuses whom do not suffer from Serious Mental Illness (SMI). However, in the case of an emergency they may Temporarily house an individual suffering from SMI.

(2).    The Diversionary Treatment Unit (DTU) is still in use as of date and is commonly used to house individuals on AC status, DC status or The Restricted Release List whom suffer from Serious Mental Illness (SMI), of which they provided 20 hours of out of cell time a week, and are provided increased mental health treatment that those in the Restricted Housing Unit may not be afforded on a regular basis.

(3).    The Behavior Management Unit (BMU) is still in use as of date and is commonly used as a program based unit to house individuals on AC status, DC status or The Restricted Release List, all while at the same time providing them with mental health treatment and incentives for good behavior. The individuals confined to this unit suffer from severe personality disorders such as anti-social personality disorder, but do not suffer from any form of Serious Mental Illness. However, in rare cases the Pennsylvania Department of Corrections have went against its own guidelines and procedures and housed individuals with Serious Mental Illness (SMI) on this unit.

(4).    The Secure Residential Treatment Unit (SRTU) is still in use as of date and is commonly used as a program based unit to house individuals on AC status, DC status or The Restricted Release List, all while at the same time providing them with mental health treatment and incentives for good behavior. However, unlike the Behavior Management Unit, The individuals confined to this unit suffer from some form of Serious Mental Illness (SMI).

(5).    The Intensive Management Unit (IMU) is a fairly newer unit, and is still in use today. The Intensive Management Unit is a long term program based housing unit of which houses the majority of Pennsylvania's prisoners who are on The Restricted Release List (RRL). Those on this unit are at a minimum confined to this unit for at least three years!

(6).    The Security/Secure Management Unit (SMU) was/is commonly used as a program based unit to house individuals on AC status, DC status or The Restricted Release List. This unit was dismantled. However, there is rumors that it is back up and operating.

(7).    The Security Threat Group Management Unit (STGMU) was commonly used as a program based unit to house individuals on AC status, DC status or The Restricted Release List

used as a program based unit to house individuals on AC (administrative Custody) status, and DC (Disciplinary Custody) status or on the Restricted Release List whom were declared to be immenent STG (Security Threat Group) threats. However, this unit and/or program was dismantled due to alleged constitutional violations.

(8).    The Long Term Segregtion Unit (LTSU) was a long term unit designed to house, and isolate those prisoners who were deemed to be the most dangerous within the Pennsylvania Department of Corrections. However, this program too was dismantled for alleged constitutional violations.

... Point being is that the Pennsylvania Department of Corrections uses, and continues to use *Indefinite/Prolonged Solitary Confinement* as a means of inflicting punishment and torture on its prisoners. *Indefinite/Prolonged Solitary Confinement* in the Pennsylvania Department of Corrections is practiced under a multitude of statuses, titles, and/or housing units (generally termed Security Level 5 Housing Units, or Restricted Housing Units) as you can clearly see above.

21.    However, the Pennsylvania Department of Corrections' most torturous form of Solitary Confinementis is it's Indefinite/Prolonged form of Solitary Confinement guised under the status known as The **Restricted Release List,** and/or the unit known as **The Intensive Management Unit (IMU)** (a unit most commonly used to house prisoners on the Restricted Release List) of which individuals confined to this unit and status are subjected to indefinite/prolonged soltary confinement with the only hope of perfuntory annual reviews.

22.    Individuals directed or approved to be subjected to the **Restricted Release List (RRL),** and **The Intensive Management Unit (IMU)** or any other **Security Level 5 Housing Unit** Status or placement beyond a period of 10-15 days is by the placement of such status, housing or programming subjected to conditions of confinement most consistent with Psychological and Physical Torture!

23.    The conditions to which one faces when subjected to the placement on the Restricted Release List, and the Intensive Management Unit, or even the generalized Security Level 5 Housing Unit within the Pennsylvania Department of Corrrections is as follows:

(1).    ***LITTLE TO NO SOCIAL INTERACTION*** - Where of which one whom is subjected to said conditions of confinement is confined (besides the DTU and SRTU) to a cell for up to at the very least 21 to 22 hours a day, at which time he/she (**unlike the general population, the DTU, and the SRTU**) is deprived of all human contact or interaction unless he/she is being escorted by corrections staff around the unit or institution in handcuffs; and/or unless he/she is screaming out to other prsioners on the unit through his/her cell door to communicate (**which in itself is prohibited**) and could be draining and exhauasting. *Wherefore*, individuals subjected to these conditions of confinement (**unlike general population**) are deprived of all human contact and/or interaction unless he/she is talking to another prisnoer through a small vent in his or her cell, or even a toilet which could be pain aching depending on where the vent, and toilet is located.

*Wherefore*, individuals subjected to these conditions of confinement **(unlike general population)** are deprived of all human contact and/or interaction unless he/she attends the recreational yard with other prisoners which is a small cage similiar to that of a dog kennel about the size of a cell! *Wherefore*, individuals subjected to these conditions of confinement **(unlike general population)** are deprived of contact visits with family and friends, and in the case of the IMU are even deprived of non-contact visits through a glass! *Wherefore*, individuals subjected to these conditions of confinement are deprived of all human contact and/or interaction even with staff for any conversations outside of that concerning institutional matters is frowned upon, and in many cases considered fraternisation (which is prohibited) thereby discouraging both prisoners and staff from having civilized conversations with one another! *Wherefore*, individuals subjected to these conditions of confinement **(unlike general population)** are deprived of daily contact with family and friends due to the fact that telphone use on a daily basis in most cases **(unlike general population)** in prohibited, as well as the sending out and recieving of emails from friends and family!

(2).    ***LITTLE TO NO ENVIROMENTAL STIMULATION*** - Where of which one whom is subjected to said conditions of confinement (besides the DTU and SRTU) is confined to a cell for up to at the very least 21 to 22 hours a day, at which time he/she **(unlike the general population DTU, and SRTU)** is deprived of the ability to partake and/or engage in daily out of cell programming, and or groups! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population, the DTU, and the SRTU)** are deprived of the ability to partake in educational classes, and even correctional plan programming! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population, the DTU, and the SRTU)** are deprived of the ability to partake out of cell religious services, and/or out of cell activities such as open gym, yoga classes, mural arts programming, open library, weight lifting, and other activities offered to individuals in the General population, DTU, and or SRTU, and/or RTU!!!

(3).    ***LITTLE TO NO MENTAL HEALTH TREATMENT*** - Where of which one whom is subjected to said conditions of confinement (besides the DTU and SRTU) is confined to a cell for up to at the very least 21 to 22 hours a day, at which time he/she **(unlike the general population)** is deprived of EFFECTIVE MENTAL HEALTH TREATMENT, due to there not being enough mental health personnel to assist and accomodate the mental health needs of all those confined to these statuses and units. Where in most cases the ones (mental health staff) who are assigned to deal with prisoners in and on these statuses, and in these units possess some form of racial or prejudicial biases against prisoners (especially black and latino prisoners) which makes it impossible for them to do their jobs or for prisoners in these units to work with them effectively! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population, the DTU, and the SRTU)** are deprived of EFFECTIVE MENTAL HEALTH TREATMENT, due to the fact that the majority of mental health staff, and or staff in general assigned to these units either do not report the mental health issues, or mental health crisis taking place in these units, and/or deliberatley undermine, and ignore the seriousness of the mental health issues taking place in these units, as well as the negative side-effects that these units (in their conditions) are having on individuals mental health by mislabeling such mental

health conditions, and behaviors as manipulative or maladaptive!

(4).     ***LITTLE TO NO MEDICAL TREATMENT*** - Where of which one whom is subjected to said conditions of confinement (besides the DTU and SRTU) is confined to a cell for up to at the very least 21 to 22 hours a day, at which time he/she **(unlike the general population)** is deprived of MEDICAL TREATMENT due to the scam the Pennsylvania Department of Corrections is running on prisoners in these unit, where the Pennsylvania Department of Corrections refuses to sell basic medications, and hygiene products on the commissary within these units, thereby if one has a headache or developes dry skin or dangeruff, etc., he is forced to go through medical to purchase the products to alleviate these issues. Where in doing so, he/she is forced to pay three times the amount for said prescriptions and or hygiene products then it cost in both the store and commisary of which in most cases you only get a potion of the prescription, and or product! This system is equivalent to a system of extortion (You will only recieve help for basic haman issues an needs only if you are willing to pay unnecessary costs)! This in and of itself discourages prisoners from seeking medical treatment, therby depriving them of such in whole!

(5).     ***LITTLE TO NO SLEEP*** - Where of which one whom is subjected to said conditions of confinement (besides the DTU and SRTU) is confined to a cell for up to at the very least 21 to 22 hours a day, at which time he/she **(unlike the general population)** is deprived of SLEEP, due to cell lights being on 24 hours, and 7 days a week! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population)** are unable to sleep due to the constant and continuous smell of body odor of prisoners whom dont shower or clean their cells, and/or the constant smell of urine and or fecal matter of prisoners whom play in their own bodily fluids on a daily and regular basis! *Wherefore*, individuals subjected to these conditions of confinement (unlike the general population) are unable to sleep due to the constant and continuous yelling, screaming, and banging on cell doors of nearby mental health prisoners on a daily and nightly basis. *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population)** are unable to sleep due to the poor air quality on the unit which provides little to no air circulation! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population)** are unable to sleep due to the air temperature within thes the cells on these units being either extremely cold or exremely hot! *Wherefore*, individuals subjected to these conditions of confinement **(unlike the general population)** are unable to sleep due to one being subjected to two three inch plastic mattresses planted on steel frames for long periods of time without any real ability to gain any form of real exercise which causing extreme pain and body aches throughout the day and night making it all but impossible to sleep!

(6).     ***LITTLE TO NO EXERCISE*** - Where of which one whom is subjected to said conditions of confinement (besides the DTU and SRTU) is confined to a cell for up to at the very least 21 to 22 hours a day, at which time he/she **(unlike the general population)** is deprived of ADEQUATE AND OR APROPRIATE EXERCISE due to one confined to these units not being afforded the means of an adequate space to properly exercise outside of a cage the size of a cell, and no access to a proper AC yard, or indoor recreation area that may provide proper exercise equipment such as pull up, and dip bars, bike machines, and treadmills, and or even weight

machines, or a half court basketball court, or space to run causing one constant pain and ones body to deterioarte over time!

...These conditions and or deprivation of such human necessities as a collective, and or whole *can, will, and have* been proven over and over again by the Department of Corrections itself, the third circuit and sister courts, as well as the Department of Justice to be extremely detrimentle and dangerous to ones physical and mental health! Especially when one is subjected to endure these conditions for over a period of 10-15 days! In fact the third circuit court had asserted that subjecting individuals to these conditions for over thirteen months is cruel and unusual punishment. However, the Pennsylvania Department of Corrections continues to rebeliously and maliciously subject its prisoners to theses conditions indefinitely and for prolonged periods knowing that these conditions will sooner or later cause both psychological and physical harm!

24.      According to the third circuit court, sister courts, as as well as the Department of Justice, and specialists around the country, these conditions of indefinite and prolonged solitary cconfinement pose a severe threat to ones mental and physical health. Studies have further shown that nonvoluntary solitary confinement that lasted longer than 10 days failed to result in negative psychological effects. Such effect are but not limited to the foregoing:

(1).     The exacerbation of pre-existing mental health issues;
(2).     Severe and traumatic psychological damage, including anxiety, panic, paranoia, depression, post traumatic stress disorder, psychosis, and even disintegration of the basic sense of self identity; Sensory deprivation, a degree of stupor, difficulties with thinking and concentration, obssessional thinking, agitation, irritability, and difficulty tolerating external stimuli; Hallucinations, claustrophobia, cognitive decline, short term memory loss and suicidal ideations; Physical deterioration, weight loss, hypertension, heart abnormalities, and the aggravation of pre-existing medical problems!

25.      These are just some of the causes of indefinite or prolonged solitary confinement. There are dozens of reports and case cites that expand and touch on the dangers of these conditions of indefinite and prolonged solitary confinement especially of those suffering from pre-existing mental health issues. Even the **United Nations in October of 2011 issued a report recommending that ALL COUNTRIES ban solitary confinement in excess of 15 days**! That such placement in solitary confinement beyond such a period can amount to **torture**! In or about 2014 The Department of Justice filed a detailed report declaring Pennsylvania's practice of solitary confinement (especially of the mentally ill) was unconstitutional! This report was issued to all institutions throughout the Pennsylvania Department of Corrections. Defendant Laurel Harry, and Tabb Bickle themsleves recieved personal copies of this report. This information concerning the dangers of indefinite and/or prolonged solitary confinement have been known to the public the courts, as well as all the Defendants in this here matter prior to and at the time of the matters clomplained herein!

26.      These risks are so well known that The Pennsylvania Department of Corrections has established and put in place strict policy and procedures that must be taken by institutional

officials to recommend, consider, and to place individuals onto the Restricted Release List (RRL) (a status that subjects one to conditions of indefinite solitary confinement).

27.     Before placing an individual on the Restricted Release List (RRL) and subjecting him/her to the mental health risks posed by placement in indefinite solitary confinement, prison officials must first identify whether or not said individual meets the criteria for placement on the Restricted Release List (RRL) to begin with. Such criteria for placement on the Restricted Release List (RRL) includes but is not limited to the following:

> (a).     Assaultive history against staff;
> (b).     Assaultive history against inmates;
> (c).     Perpetuated sexual abuse history;
> (d).     Escape history, or serious escape attempt; and/or
> (e).     Threat to the orderly operation of a facility (i.e. attempting to organize inmates, demonstrated involvement in a Security Threat Group (STG) that poses a risk to the security of the facility, etc..).

*See: EXHIBIT-A1, DC-ADM 802, Administrative Custody Procedures Manual, Section 1, C...*

28.     However, despite one potentially meeting the criteria for placement on the Restricted Release List (RRL), this criteria in and by itself does not warrant or justify one being placed on The Restricted Release List (RRL) and subjected to the conditions of indefinite solitary confinement as described above!

29.     According to the Pennsylvania Department of Corrections' Restricted Release List policy, the criteria for placing one on the Restricted Release List is contingent upon whether or not institutional officials find and/or declare that said individual being recommended for Restricted Release List placement **Poses a threat to the secure operation of the facility *and* where a transfer to another facility or jurisdiction would not alleviate the security concern."** *See: EXHIBIT-A1, DC-ADM 802, Administrative Custody Procedures Manual, Section 1, C...*

30.     There are dozens if not hundreds of prisoners withtin the Pennsylvania Department of Corrections whom meet this criteria (some many times over) whom are not on the Restricted Release List! The reason being, is because this criteria is not the **foundational requirement** for placement on the Restricted Release List, it is simply the requirement for placement after the **foundational requirement** has been met!

31.     What differentiates those whom meet the criteria (whom are *not* on the Restricted Release List) from those who meet this criteria and *are on* the Restricted Release List is that those who have been placed on the Restricted Release List have been found and/or declared to **Pose a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern.** *See: EXHIBIT-A1, DC-ADM 802,*

*Administrative Custody Procedures Manual, Section 1, C...*

32.     To assist in determining whether or not an individual *poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern* warranting his placement on the Restricted Release List, The Pennsylvania Department of Corrections demands that: "The assigned counselor shall initiate the DC-46 Vote Sheet, and provide all supporting documentation related to the justification for the recommended placement on the Restricted Release List". *See: EXHIBIT-A1, and EXHIBIT-A2, DC-ADM 802, Administrative Custody, and Procedures Manual, Section 1, C...*

33.     The Pennsylvania Department of Corrections through it's own policy demands that "The packet, at a minimum, must include the Restricted Release List Placement/Annual Review/Removal Request Form, The DC-46 Vote Sheet, and a Psychological Evaluation of the individual recommended for RRL placement that had been conducted in the last six months of the RRL recommendation... *See: EXHIBIT-A1, and EXHIBIT-A2, DC-ADM 802, Administrative Custody, and Procedures Manual, Section 1, C...*

34.     These documents are vital to the decision making process of placing an individual on the Restricted Release List (herein after RRL). For without said documents, Pennsylvania Department of Corrections officials would not have the ability to determine whether or not the individual being recommended for RRL placement *poses a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern* warranting his placement on the Restricted Release List!

35.     While at the State Correctional Institution (SCI) Forest in Marienville Pennsylvania (herein after SCI-Forest), Plaintiff's institutional counselor (James) and Defendant Irwin initiated documentation (including a DC-46 Vote Sheet) on March 9, 2024 recommending that he (Plaintiff) be placed on the Restricted Release List (RRL). *See: EXHIBIT-B1, Memo Addressed to Defendant Robert Marsh, By Defendant R. Irwin, and Counselor James, recommending Plaintiffs placement on RRL dated 3/9/2023; EXHIBIT-B2, DC-46 Vote Sheet recommending Plaintiff's Placement on RRL dated 3/9/2023...*

36.     The rationale and or justification explained on the DC-46 Vote Sheet, and related documents for such recommendation (RRL), and placement revolved around elements that (if true) met the overall criteria for RRL placement, but not the **foundational requirement** (posing a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern) for placing one on the RRL! *See: EXHIBIT-B1, Memo Addressed to Defendant Robert Marsh, By Defendant R. Irwin, and Counselor James, recommending Plaintiffs placement on RRL dated 3/9/2023; EXHIBIT-B2, DC-46 Vote Sheet recommending Plaintiff's Placement on RRL dated 3/9/2023; EXHIBIT-B31 and EXHIBIT-3B2,, Restricted Release List Placement/Annual RRL Review/Removal Request*

37.     In fact, SCI-Forest's security captain (Captain Kundick) did not agree with the

Defendant's justification and rationale for seeking to place Plaintiff on the Restricted Release List, for he (Captain Kundick) (as he had verbally expressed to Plaintiff in person) did not feel that Plaintifff had met the foundational requirement for placement on the RRL (posing a threat to the secure operation of the facility and where a transfer to another facility or jurisdiction would not alleviate the security concern).

38.    Therefore, he (Captain Kundick) refused to sign off on the DC-46 Vote Sheet recommending placement of Plaintiff on the RRL, for there was no penological justification for said placement! *See: EXHIBIT-B2, DC-46, Vote Sheet recommending Plaintiff's Placement on RRL dated 3/9.2023...*

39.    However, despite Captain Kundick's refusal to sign off on the DC-46 Vote Sheet (the documentation recommending Plaintiff's placement on the Restricted Release List), said DC-046 Vote Sheet and related documentation was still processed without any meaningful penological hustification.

40.    Furthermore, to undermine the seriousness of Plaintff's pre-existing mental health issues, and the risk of danger posed to Plaintiff's mental and physical health by subjecting Plaintiff to **Indefinite/Prolonged Solitary Confinement**, as well as to ensure his placement on the Restricted Release List, Defendat Bruce Simons compiled a false, and/or fabricated psychological evaluation of Plaintiff which was used as a determining factor in his (Plaintiff's) placement on the Restricted Release List!

41.    In his false and/or fabricated psychological evaluation, Defendant Bruce Simons falsley proclaimed that he along with another psychologist (PSS. Crissman) had conducted a psychological evaluation on Plaintiff for placement on the Restricted Release List. However, this is false! Defendant Bruce Simons never conducted a Psychological evaluation for Plaintiff at any time for anything yet alone RRL placement. Evidence of this fact could be found in the inconsistencies, and falshoods and Defendant Simons' Psychological evaluation itself! According the Defendanst Simons (in the first paragraph of his so-called pyschological evaluation for Plaintiff's placement on RRL) he proclaims that: *"he had conducted the RRL psychological evaluation of Plaintiff in the J-Unit Law Library"*, then contradicted his own statement (in the same paragraph) by stating that *"Plaintiff was unable to sign the informed consent form for the RRL psychological evaluation because he (Plaintiff) was interviewed at his cell door"*! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

42.    However, Pyschologist Service Specialist (PSS) Crissman on page 2 of 5 of this same Psychological Evaluation (EXHIBIT-C1), contradicted Defendant Simons version of the account by proclaiming that: *"he (PSS. Crissman) met with Plaintiff in the J-Unit Law Library (SCI-Forest) on this date to complete his RRL evaluation, and that Plaintiff willingly signed the Mental Health Informed Consent Form (for his RRL evaluation)"*, only to turn around and also contradict his own statement on the informed consent document itself by stating that *"Plaintiff was unable to sign said document because he was confined!" See: EXHIBIT-C1,*

*Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

43. The reason why there exists multiple different accounts as to how, and where Plainitff's RRL evaluation was conducted and whom conducted it, is because Plainitff was never evaluated for RRL placement by either Crissman or Defendant Simons! Further evidence of the fact that this so-called RRL Psychological Evaluation never took place, could be found in the body of the RRL evaluation itself. The majority of the content of which Defendant Simons had compiled to complete the fabricated evaluation was information taken from an incorrect Integrated *Case Summary* of Plaintiff, as well as the *history and institutional adjustment of another inmate* (namely **inmate Bradley** whom happened to be four cells away from Plaintiff at the time)!

44. First and foremost, Defendant Simons (in the first paragraph of the psychological evaluation) refers to Plainitff as **Mr. Bradley**! It is important to note in this body of facts that Plaintiff is not MR. BRADLEY! In fact Mr. Bradley (Vernan Bradley) is a whole nother prisoner whom was four cells away from Plaintiff at the time of this so-called evaluation! Futhermore, if this is not enough, Defendant Simons goes on to allege that Plaintiff had been on (at the time) Disciplinary custody for the past 449 days. Again this sounds like Mr. Bradley he is speaking of, for Plaintiff had only been on Disciplinary Custody at the time for some 45 days! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

45. However, the fabrications do not stop here. According to Defendant Simons in this same report he falsley proclaimed that:

> (1). *"Mr. Rivera (Plaintiff), is an active and verified member of the Bloods Gang (Specifically The Bounty Huntr Bloods)..."*

However, there is not one security report, security concern, or any evidence on file to support this false allegation that Plaintiff is an ACTIVE member of the Bounty Hunter Bloods Gang or any gang for that matter! Plaintiff has not been active as a gan member in nearly 5 plus years! This is a fabricated and blatant lie! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

> (2). That *"Mr. Rivera was placed in the STGMU (Security Threat Group Management Unit) program (commonly reffered to as The Gang Unit) and subsequent Step-Down program!"*

Again there is no record, file or any form of evidence to support that Plaintiff had ever been in the STGMU or any Step-Down program! This is a fabricated and blatant lie! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

> (3). *That "Mr. Rivera has a total of 42 misconducts, 7 within this facility (SCI-Forest). He has a number of violent misconducts: 7 threatening others, 5 fighting, 2 assault, and 2 engaging in a fight..."* However, in this same

paragraph of the report he alleges that: ***"Mr. Rivera (Plaintiff) has 55 misconducts!"*** Defendant Simons further alleges that: ***"his (Plaintiff's) most recent violent misconduct was on 7-20-19 in this facility (SCI-Forest) for walking into another inmates cell and engaging in a fight."***

Again this is all false. The misconduct history that Defendant Simons attempts to fabricate is not the misconduct history of Plaintiff that is on record! Secondly, on one hand Defendant Simons alleges that Plaintiff has a record of 42 misconducts, then on another hand he alleges Plaintiff has a record of 55 misconducts! WHICH ONE IS IT?! Lasly, Defendant Simons alleges that Plaintiff's most recent violent misconduct at the time was dated 7-20-19 in SCI-Forest for walking into another inmates cell and enganing in a fight. Plaintiff was never in SCI-Forest in or on 7-20-19 (he was in SCI-Frackville), thereby he could have never walked into someones cell at SCI-Forest and engaged in a cell fight! This was all fabricated by Defendant Simons to ensure Plaitiff's placement on RRL! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

46.    Lastly, in the recommendations section of this same psychological evaluation, Defendant Simons proclaimed that he was recommending RRL placement due to:

> **(1). Plaintiff's poor instituonal adjustment (which was based on false and fabricated information), and;**
>
> **(2). Due to the fact that he: "Mr. Rivera (Plaintiff) presents as manipulative and highly assaultive towards any staff given the opportunity regardless of their position and/or sex"!**

As we have foreseen in the previous paragraph, Defendants Simons version of Plainitiff's history, and or institutional adjustment is based off of false and/or fabricated information. As to Plainitff presenting as manipulative manipulative and highly assaultive towards any staff given the opportunity regardless of their position and/or sex! Again this is false! There is absolutely no record to indicate or back the claim that Plaintiff is manipultive and highly assaultive to staff GIVEN THE OPPORTUNITY, nor is there any record to show or indicate that Plaintiff has ever been manipulative or assualtive in any form of way to any female staff! *See: EXHIBIT-C1, Special Psychological Assessment, By Defendant Bruce Simons dated 3/31/23...*

47.    Despite the arsenal of misinformation, and fabrications contained within Defendant Simons so-called Psychological evaluation for Plaintiff's RRL placement, Defendant Simons still submitted, and filed this evaluation with Plaintiff's RRL packet as the so-called Psychological Evaluation conducted for PLaintiff's placement on the Restricted Release List! This false, and Fabricated Psychological Evaluation for RRL placement was then forwarded along with the rest of the RRL placement paperwork to Defendant Tabb Bickle, and Defendant Tammy Ferguson for reviewing!

48.    The purpose of this so-called psychological evaluation was to evaluate Plaintiff's mental health history, and state of mind, to make a determination of whether or not such a placement would be beneficial or detrimental to his mental and/or physical health! The reasons for the necessity of such evaluation is due to the risks posed by such placement on **the Restricted Release List (indefinite/prolonged solitary confinement)**.

49.    Defendant's Tabb Bickle, Tammy Ferguson, as well as Laurel Harry had personal knowledge of the dangers and risks posed by subjecting one (especially one with pre-existing mental health issues) to solitary confinement beyond a period of 15 to 30 days. They were even more aware of the severe and potentially permanent harm that one (especially one with pre-existing mental health issues) is at risk of suffering from when subjected to indefinite/prolonged solitary confinement as addressed above in paragraphs 21-26! *See: EXHIBIT-D, Investigation of The Pennsylvania Dpartment of Corrections Use of Solitary Confinement on Prisoners With Serious Mental Illness dated February 14, 2024.*

50.    However, despite their knowledge of the risks posed by Indefinite/Prolonged Solitary Confinement (RRL) as well as the clear and well known fabrications in the Psychoogical Assessment for Restricted Release List placement; Defendants Tabb Bickle and Tammy Ferguson on/or about May 9, 2023 still made a collaborated decision of placing Plaintiff on the Restricted ReleaseList (RRL). Thereby, subjectiong him to the cruel and unusual risks posed by the conditions of **Indefinite / Prolonged Solitary Confinement!** *See: EXHIBIT-B1, Memo Addressed To Defendant Robert Marsh, By Defendant R. Irwin, and Counselor James Recommending Plaintiff's Placement on The Restricted Release List dated 3/9/2023; EXHIBIT-B2, DC-46 Vote Sheet Recommending Plaintiff's Placement on RRL dated 3/9/2023; EXHIBIT-B3, and B4, Restricted Release List Placement/Annual RRL Review/Removal Request...*

51.    Furthermore, despite the absence of any determination and/or finding that Plaintiff posed, and/or **"poses a threat to the secure operation of the facility *and* where a transfer to another facility or jurisdiction would not alleviate the security concern"** (which is the foundational requirement for placement of one on the Restricted Release List), Defendants Tabb Bickle and Tammy Ferguson on/or about May 9, 2023 still made a collaborated decision of placing Plaintiff on the Restricted Release List (RRL). Thereby, subjectiong him to the cruel and unusual risks posed by the conditions of **Indefinite / Prolonged Solitary Confinement!** *See: EXHIBIT-A1, and A2, DC-ADM 802 Administrative Custody, and Procedures Manual, Section I, C...*

52.    Defendants Tabb Bickle and Tammy Ferguson made this collaborated decision on May 9, 2023 without *any form of hearing to challenge such placement or notice*! Plaintiff did not find out about said placement on the Restricted Release List until the following day (May 10, 2023) when he had a virtual pefuntory hearing on the matter! *See: EXHIBIT-B3, and B4,*

*Restricted Release List Placement/Annual RRL Review/Removal Request...*

53.    Instead of exercising some form of integrity or sense of humanity despite her personal knowledge of the risks posed by subjecting one to the **RRL** status (**Indefinite / Prolonged Solitary Confinement**); It was at this pefuntory hearing that *Defendant Laurel Harry* established that she supported, affirmed, and was thereby going to re-enforce Defendant Tabb Bickle and Tammy Ferguson's collaborated decision of placing Plaintiff on the **Restricted Release List**, and subjecting him to conditions of **Indefinite/Prolonged Solitary Confinement**! *See: EXHIBIT-D, Investigation of The Pennsylvania Dpartment of Corrections Use of Solitary Confinement on Prisoners With Serious Mental Illness dated February 14, 2024, and See: EXHIBIT-B3, and B4, Restricted Release List Placement/Annual RRL Review/Removal Request...*

54.    The overall and general reasons for allegedly placing Plaintiff on the Restricted Release List (according to the record) is and was due to:

(1) Assault on a staff member,

(2) Failure to progress in the Behavior Management Unit (BMU), and

(3) Failure out of the Behavior Management Unit (BMU) program.

55.    However, the record will forever reflect that ***Assault on a staff member*** **does not in and of itself require or justify one being placed ont he Restricted Release List (RRL) and subjected to conditions of indefinite/prolonged solitary confinement! In order to place an individual on the Restricted Release List, prison offficials *must first* find and declare that an individual (Plaintiff) "Poses a threat to the secure operation of the facility *and* where a transfer to another facility or jurisdiction would not alleviate the security concern"!** Prison officials and or Defendants have failed to establishe and/or find that Plaintiff meets this **foundational requirement**! In fact to be placed on the Restricted Release List prison officials must establish that Plaintiff meets this requirement! In fact, the evidence on record will show that Plaintiff has been transferred since his placement on the Restricted Release List, and has not aquired a misconduct since as of date which is sixteen plus months and counting! *See: EXHIBIT-A1, and A2, DC-ADM 802 Administrative Custody, and Procedures Manual, Section 1, C; EXHIBIT-B1, Memo Addressed To Defendant Robert Marsh, By Defendant R. Irwin, and Counselor James Recommending Plaintiff's Placement on The Restricted Release List dated 3/9/2023; EXHIBIT-B2, DC-46 Vote Sheet Recommending Plaintiff's Placement on RRL dated 3/9/2023; EXHIBIT-B3, and B4, Restricted Release List Placement/Annual RRL Review/Removal Request...*

56.    Secondly, as to his placement on the Restricted Release List due to him not progressing in the BMU program, and subsequently failing out of the BMU program these are both false and fabricated allegations!

(1) There is absolutely no evidence to support that Plaintiff failed to progress in the BMU

program. In fact, evidence will show and support that Plaintiff made far more progress than most individuals in said program at the time!

(2) Plaintiff had never once failed out of the BMU program! There is no record on file to support such claims! In order to get failed out of the BMU program (according to the Pennsylvania Department of Corrections own policy), an individaul being reviewed for failure out of the BMU program *must* be evaluated by the Special Observation Assessment Unit (SOAU) to determine if failure out of said program is necessary or detrimental! Therefore, one could not be removed from the BMU without such evaluation! Plaintiff at the time of his recommendation for RRL placement had never been evaluated for BMU removal by SOAU officials, nor at the time of his placement on the Restricted Release List! In fact, Plaintiff was not reviewed by SOAU officials for potential BMU failure until after he had already been placed on the Restricted Release List (RRL) for failure out of the program! The allegations and rationale for his RRL placement (concerning his failure out of the BMU program) was a fabricated and false allegation made by Defendants Bruce Simmons, R. Irwing, E. Mongelluzo, M. Blicha, I. Gustafson, and J. Alexander in order to coerce and ensure Plaintiff's placement on the Restricted Release List (RRL)! Furthermore, the recorde will reflect that Plaintiff's removal from the BMU was never approved by SOAU, or Central office officials. In fact, the record supports according to Tanya S. Brandt on May 9, 2023 Plaintiff was approved for RRL placement per EDS Ferguson, and that Plaintiff should *continue* BMU programming!

As such, there is no record or evidence to support that Plaintiff had ever failed to progress in the BMU program. Nor is there any record to reflect that Plaintiff was failed out of the BMU program. All the records and evidence points to the contrary. *See: EXHIBIT-E, 13.8.1, Access To Mental Health Care Procedures Manual - BMU Section; EXHIBIT-F1, and F2, Special Program Referral Approval Rejection Form filed and dated 4/13/24 for Plaintiff's removal from the BMU program; and EXHIBIT-G, Copy of Plaintiff's Security Concerns declaring for Plaintiff to Continue placement in BMU programming!*

57.    In light of all the above facts, it is easy to conclude the foregoing cliams are true and correct as well:

(1).    That Defendants Bruce Simmons, R. Irwing, E. Mongelluzo, M. Blicha, I. Gustafson, and J. Alexander knew of and had personal knowledge of the mental health and physical risks to which they were subjecting him to when they knowingly falsifed and fabricated documentation to coerce, and ensure that Defendant Tabb Bickle, Tammy Ferguson, and Laurel Harry place Plaintiff on the Restricted Relelase List subjecting him to the harmful and torturous conditions of Indefinite/Prolonged Solitary confinement! As such they are equally responsible for his placement on/in the Restricted Release List, and Indefinite/Prolonged Solitary Confinement, and the risks posed thereof!

(2).    That Defendants Tabb Bickle, Tammy Ferguson, and Laurel Harry knew of and had personal knowledge of the mental health and physical risks to which they were subjecting him to by placing him (Plaintiff) on Restricted Release List, and subjecting him to the harmful and torturous conditions of Indefinite/Prolonged Solitary Confinement! Yet still subjected him to said

despite his pre-existing mental health disorders of PTSD by placing him on the Restricted Release List (RRL), and subjecting him to the harmful and torturous conditions of Indefinite/Prolonged Solitary Confinement!

(3). The Defendants Tabb Bickle, Tammy Ferguson, and Laurel Harry placed Plaintiff on the Restricted Release List without a formal hearing or notice without the ability to challenge such placement prior to having a perfuntory hearing the following day, and never gave him the ability to appeal such decision of RRL placement (Indefinite/Prolonged Solitary Confinement).

58.    On May 11, 2023 at approximately 8:00 a.m. Plaintiff was seen by his counselor (James) at his cell door who had informed him (Plaintiff) that he (Plaintiff) was officially placed on the Restricted Release List.

59.    Later on that day (May 11, 2023) Plaintiff, was reviewed by SCI-Forests PRC (the Program Review Comittee) where he had informed them that he had been reviewed for RRL placement the day prior, and according to his counselor this morning he was officially placed on the Restricted Release List. Defendants Irwin, Blicha, Gustafson, and Alexander were all present at this PRC meeting and had informed Plaintiff (collectively) that they were all well aware of his placement on the Restricted Release List.

60.    Defendants Irwin, Blicha, Gustafson, and Alexander further informed Plaintiff that though he did not meet the foundational requirement for RRL placement, that they were instructed by Defendant Robert Marsh to put in the paper work and assist in the placing of Plaintiff on the Restricted Release List. That he (Marsh) would speak with Defendants Ferguson, and Harry personally about overlooking the foundational requirement for RRL placement.

61.    When Plaintiff asked about why he had not been seen by anybody from the Special Observation Assessment Unit (SOAU) to approve and/or recommend his removal from the Behavior Management Unit (BMU) prior to being removed from and/or placed on the Restricted Release List and/or removed from the BMU, Defendants Irwin, Blicha, Gustafson, and Alexander (collectively) informed Plaintiff that they did not have enough time to get all the paper work in order. That Defendant Marsh wanted Plaintiff placed on the Restricted Release List sooner than later. Therefore, they (Irwin, Gustafson, Blicha, and Alexander) directed Defendant Bruce Simons to copy and paste a bunch of shit onto the evaluation form, and dress it up real good. *See: EXHIBIT-H, DC-141, Part 4, 90 Day Review form, and EXHIBIT-C1, Special Psychological Assessment, By Bruce Simons dated 3/31/23.*

62.    After expressing these admissions to Plaintiff, they went on to inform Plaintiff that they were going to be sending him to the Intensive Management Unit (IMU) which was where they now house individuals on The Restricted Release List!

63.    According to Defendants Irwin, Gustafson, Blicha, and Alexander, they had

informed Plaintiff that while on the Restricted Release List (RRL) that the state had to afford him annual due process by way of an annual hearing to review his placement and potential removal from the Restricted Release List!

64.    They further admitted however, that because they were sending him to the Intensive Management Unit (IMU) that the annual review would be obsolete for his removal from RRL would be exclusively dependant upon his completion of the Intensive Management Unit program! Therefore, any annual review hearings he may recieve for RRL removal would be *perfunctory* in nature! They further explained that the IMU was created to get around this one year annual review. That the IMU gave them justification to justify keeping individuals on the Restricted Release List longer than necessary beyond that one year annual review. Evidence of this truth could be found in the fact that Plaintiff recently had an RRL review for potential removal from the Restricted Release List (RRL) in July of 2024, and was denied removal from the Restricted Release List by the Executive Deputy Secretary of Institution Mr. Wenerowics soley because he had not had enough time in the IMU despite his year on RRL without any misconduct!

65.    Plaintiff on May 11, 2023 filed both Request Slips to PRC, and numerous Grievances against Defendants Harry, Bickle, Ferguson, Irwin, Simons, Gustafson, Blicha, and Alexander concerning all of the above and the constitutional violations that they were subjecting him to which are claimed herein this complaint, as well set forth his appeal agianst his placement on RRL and IMU recommendations. In these grievances Plaintiff also sought out the compensantory, and punitive damages sought out in this here complaint. However, SCI-Forest officials (Grievance Coordinator and PRC Team) refused to file these grievances and request for the appealing of his RRL palcement.

66.    On May 18, 2023 at another PRC hearing Plaintiff addressed these concerns concerning institutional officials refusal to file his grievances and requests appealing and complaining about his RRL, and IMU placement. Defendants Irwin, Blicha, Gustafson, and Alexander informed Plaintiff that there was alot of flaws in his RRL process and they didnt need that type of stuff being exposed. Therefore, they had instructed the Grievance Coordinator not to file said grievances. As for his RRL appeal requests, Defendants Irwin, Blicha, Gustafson, and Alexander all informed plaintiff that he was not allowed to appeal his RRL placement or his IMU recommendation.

67.    It was at this point that Plaintiff began to verbally complain about being placed on the Restricted Release List for allegedly failing out of the BMU but was still in the BMU, and had never been seen by Special Observation Assessment Unit (SOAU) officials authorizing his removal from the Behavior Management Unit as demanded by policy! Defendants Irwin, Blicha, Gustafson, and Alexander informed Plaintiff that he was correct and that they had dropped the ball. However, it didnt matter because he was already on the Restricted Release List. However, if it made him (Plaintiff) feel better then they would schedule him to be seen by the  Special

Observation Assessment Unit (SOAU) officials as soon as they could. Defendants Irwin, Gustafson, Blicha, and Alexander further admitted in order to send him to the Intensive Management Unit (IMU) that it had to be a collective decision between them and Mrs. Cynthia Wright who they would schedule Plaintiff to see shortly.

68. On June 1, 2023 Plaintiff was interviewed by Defendant Cynthia Wright (an SOAU official) for removal from the BMU and alternative program placement. Defendant Wright recommended that Plaintiff be removed from the Behavior Management Unit (BMU), and subsequently placed in the Intensive Management Unit (IMU) for two years! *See: EXHIBIT-I, Special Psychological Assessment for BMU removal, By Cynthia Wright dated 6/1/23.*

69.    Defendant Cynthia Wright knew of the mental health, and physical risks of placing Plaintiff in the Intensive Management Unit which would subject him to Indefinite/Prolonged Solitary Confinement. However, though he was already being subjected to such conditions by being placed on the Restricted Release List, placement in the Intensive Management Unit (IMU) was far more harsher. For as an individual subjected to placement in the IMU, he would be deprived for the first 18 months of all privileges afforded to an individual on the Restricted Release List such as extended commissary, daily phone calls, and emails, Non-contact glass visits, photographs, etc...

70.    Again, Defendant Cynthia Wright knew of the mental health, and physical risks of placing Plaintiff in the Intensive Management Unit (IMU) which would subject him to excessive conditions of Indefinite/Prolonged Solitary Confinement, yet she still falsified documentation against Plaintiff to undermine the seriousness of his mental health in order to justify her recommendations in placing Plaintiff in the Intensive Management Unit. In doing so she took personal action in assisting Defendants Irwin, Gustafson, Blicha, and Alexander in officializing Plaintiff's placement in the IMU.

71.    However, Defendant Wrights recommendation for BMU removal was moot for Plaintiff had already been prematurely placed on the Restricted Release List for BMU failure a month prior to seeing her to be removed from the BMU. To add to this atrocity, Defendant Ferguson on May 9, 2023 directed that *Plaintiff continue placement in the Behavior Management Unit* **(NOT THE IMU)**! Evidence of this could be found in Plaintiffs institutional security concerns which is attached as EXHIBIT-J! Lastly, despite Wrights recommendation to remove Plaintiff from the BMU, Department of Corrections officals never removed him from the Behavior Management Unit as shown in the Special Program referral Approval/Rejection Form recommending BMU removal! *See: EXHIBIT-J, Copy of Plaintiff's Institutional Security Concerns; and EXHIBIT-K, Special Program referral Approval/Rejection Form Recommending BMU Removal.*

72.    On June 8, 2023, Defendant Marsh paid Plaintiff a visit while at SCI-Forest on J-Unit, C-pod, 10 Cell between approximately 11:00 a.m. and 12:00 P.M. at SCI-Forest with

Defendant Gustafson.

73.    Plaintiff asked Defendant Marsh, and Gustafson, "how they were getting away with placing him on the Restricted Release for failure out of the BMU, and he never failed out of the BMU?" Defendant Marsh declared that it was a team effort between him and the rest of the Defendants in this matter. Gustafson agreed. Defendant Marsh declared that the hearings, vote sheets, and other paper work aint mean shit. That they were all formalities to look good. That he and all the Defendants were the ones who made the decisions as a collective! And if RRL is where we want you despite the procedurtes employed then RRL is where we'd place you he declared!

74.    He further admitted that this was the punishment for Plaintiff laying hands on his friend Michael Knapp. He further expressed that Plaintiff would be on his way to the Intensive Management Unit and that once he got there (to the IMU) that he (Plaintiff) would sign the paperwork agreeing to partake in the program. That if he didnt that he would enure that Plaintiff never got out of lockdown so long as he worked for the Department of Corrections.

75.    On June 8, 2024 Plaintiff filed two grievances alleging constitutional violations against Marsh, Wright, and all the other Defendants for the above and seeking Compensatory and punitive damages just as before. But just as before institutional officials impeded on Plaintiff's ability to exhaust his administrative remedies by refusing to file his grievances and respond to his follow up requests of which he submitted to the Defendants via request.

76.    Plaintiff was later transferred to the Intensive Management Unit (IMU) on or about June 29, 2023 where he out of fear of never getting out of lockdown (as told by Defendant Marsh) signed the form to agree to partake in the IMU program on or about June 30, 2023.

77.    As a result of Defendants actions, Plaintiff has been subjected to excessive conditions of Indefinite/Prolonged Solitary Confinement for well over 14 months where he has suffered foresceable deprivations of basic human needs outlined in parapgraphs 23 of this here complaint, as well as the foregoing and forseeable injuries which include and continue to include but are not limited to the foregoing:

        (1).    Exacerbated PTSD symptoms such as Paranoia, Depression, Hypervigilence, Mood Swings, and Disassociative episodes;

        (2).    Psychosis;

        (3).    Short term memory loss, and cognitive decline making it impossible for him at times to remember things, and or complete tasks due to inaboilty to concentrate or understand things;

        (4).    Depression, Stress, and increased anxiety;

        (5)    Daily Fear, Hopelessness, Emotional Distress, and suicidal thoughts where death at many times seems far more easier than this reality;

        (6).    Suicidal Ideations such as cutting, and refusal to eat;

(7).    Distrust, and

(8).    Body aches...

## V.    EXHAUSTION OF ADMINISTRATED REMEDIES:

78.    As addressed in the verified facts of this here compliant which shall be accepted as true. Plaintiff exhausted all AVAILABLE administrative remedies made available to him as they pertain to all the issues in this here complaint. However, institutional officals impeded on his ability to exhaust said remedies by refusing to file his grievances on said matter, and refusing to answer his follow up requests pertaining to the filing of said grievances.

## VI.    CLAIMS AND CAUSES FOR RELIEF:
### A.    *Deliberate Indefference To Plaintiff's Health and Safety*

79.    The averments in the preceding paragraphs are incorporated by reference as if set forth in full herein.

80.    Defendant LAUREL HARRY, Secretary of the Pennsylvania Department of Corrections exercised Deliberate Indifference to Plaintiffs health and Safety in violation of the eighth Amendment of the U.S. Constitution when she assisted in, and enforced Plaintiff's placement on the Restricted Release List and The Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite her knowledge of said risks and Plaintiffs pre-existing mental health condition! (In her Official and Individual Capacity).

81.    Defendant TABB BICKLE, Executive Deputy Secretary of Institutions (EDSI), exercised Deliberate Indifference to Plaintiffs health and Safety in violation of the eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Release List and The Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite his knowledge of said risks and Plaintiffs pre-existing mental health condition! (In his Official and Individual Capacity).

82.    Defendant TAMMY FERGUSON, Executive Deputy Secretary of Institutions (EDSI), exercised Deliberate Indifference to Plaintiffs health and Safety in violation of the eighth Amendment of the U.S. Constitution when She assisted in, and enforced Plaintiff's placement on the Restricted Release List and The Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite her knowledge of said risks and Plaintiffs pre-existing mental health

condition! (In her Official and Individual Capacity).

83.     Defendant ROBERT MARSH, Regional Deputy Secretery (RDS), exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Release List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite his knowledge of said risks and Plaintiffs pre-existing mental health condition! (In his Official and Individual Capacity).

84.     Defendant CYNTHIA WRIGHT, Regional Chief Licensed Psychologist Manager, exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the Eighth Amendment of the U.S. Constitution when she falsified documents and assisted in Plaintiff's placement in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite her knowledge of said risks and Plaintiffs pre-existing mental health condition! (In her Official and Individual Capacity).

85.     Defendant BRUCE SIMONS, Licensed Psychologist Manager (LPM) exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Release List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite his knowledge of said risks and Plaintiffs pre-existing mental health condition! (In his Official and Individual Capacity).

86.     Defendant I. IRWIN, Superintendant exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Release List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite his knowledge of said risks and Plaintiffs pre-existing mental health condition! (In his Official and Individual Capacity).

87.     Defendant E. MONGELLUZO, Deputy Superintendant of Facility Management (DSFM), exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Release List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary confinement despite his knowledge of said risks and Plaintiffs pre-existing mental health condition! (In his Official and Individual Capacity).

88.     Defendant M. BLICHA, DSCS/DSFM, exercised Deliberate Indifference to Plaintiff's health and Safety in violation of the eighth Amendment of the U.S. Constitution when

he assisted in, and enforced Plaintiff's placement on the Rstricted Release List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition! (In his Official and Individual Capacity).

89.    Defendant I. GUSTAFSON, CCPM/DSCS, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition! (In his Official and Individual Capacity).

90.    Defendant J. ALEXANDER, Major, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution when she assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition! (In her Official and Individual Capacity).

## B.    Deprivation of Due Process of Law

91.    The averments in the preceding paragraphs are incorporated by reference as if set forth in full herein.

92.    Defendant LAUREL HARRY, Secretary of the Pennsylvania Department of Corrections, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when she assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him, and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In her Official and Individual Capacity).

93.    Defendant TABB BICKLE, Executive Deputy Secretary of Institutions (EDSI), deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In his Official and Individual Capacity).

94.    Defendant TAMMY FERGUSON, Executive Deputy Secretary of Institutions (EDSI), deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when she assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In her Official and Individual Capacity).

95.    Defendant ROBERT MARSH, Regional Deputy Secretary (RDS), deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In his Official and Individual Capacity).

96.    Defendant CYNTHIA WRIGHT, Regional Chief Licensed Psychologist Manager, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when she assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In her Official and Individual Capacity).

97.    Defendant I. IRWIN, Superintendant, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In his Official and Individual Capacity).

98.    Defendant E. MONGELLUZO, Deputy Superintendant of Facility Management (DSFM), deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant

hardship! (In his Official and Individual Capacity).

99.    Defendant M. BLICHA, DSCS/DSFM, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In his Official and Individual Capacity).

100.    Defendant I. GUSTAFSON, CCPM/DSCS, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when he assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In his Official and Individual Capacity).

101. Defendant J. ALEXANDER, Major, deprived Plaintiff of his 14th Amendment U.S. constitutional Right to Procedural Due Process of Law, when she assisted in, and enforced his placement on the Restricted Release List, and in the Intensive Management Unit exposing him to the psychological and physical risks posed by Indefinite/Prolonged Solitary Confinement without any meaningful penological justification; and/or without a hearing, the ability to challenge the allegations against him and/or challenge such RRL placement sanction which did subject him to atypical and significant hardship! (In her Official and Individual Capacity).

### C.    Cruel and Unusual Punishment

102.    Defendant LAUREL HARRY, Secretary of the Pennsylvania Department of Corrections, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when she assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite her knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*!    (In her Official and Individual Capacity).

103.    Defendant TABB BICKLE, Executive Deputy Secretary of Institutions (EDSI), exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on

the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

104. Defendant TAMMY FERGUSON, Executive Deputy Secretary of Institutions (EDSI), exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when she assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite her knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In her Official and Individual Capacity).

105. Defendant ROBERT MARSH, Regional Deputy Secretary (RDS), exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

106. Defendant CYNTHIA WRIGHT, Regional Chief Licensed Psychologist Manager, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when she assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite her knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In her Official and Individual Capacity).

107. Defendant BRUCE SIMONS, Licensed Psychologist Manager (LPM), exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

108. Defendant I. IRWIN, Superintendant, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and

Plainitff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

109. Defendant E. MONGELLUZO, Deputy Superintendant of Facility Management (DSFM), exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plaintiff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

110. Defendant M. BLICHA, DSCS/DSFM, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plaintiff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

111. Defendant I. GUSTAFSON, CCPM/DSCS, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when he assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite his knowledge of said risks and Plaintiff's pre-existing mental health condition *without any meaningful penological justification*! (In his Official and Individual Capacity).

112. Defendant J. ALEXANDER, Major, exercised Deliberate Indifference to Plaintiff's health and safety in violation of the Eighth Amendment of the U.S. Constitution; when she assisted in, and enforced Plaintiff's placement on the Restricted Rlease List, and in the Intensive Management Unit and subjecting him to the known risks posed by the collective conditions of Indefinite/Prolonged Solitary Confinement despite her knowledge of said risks and Plaintiff's pre-existing mental health condition *without any meaningful penological justification*! (In her Official and Individual Capacity).

WHEREFORE, Plaintiff, Angel Rivera, Pro Se, brings the foregoing claims against all the above defendants in their *Official* and *Individual* capacities.



VII. INJURIES:

113. Plaintiff, Angel Rivera as a result of the above stated facts and claims has suffered

all the above constitutional deprivations; as well as all of the other deprivations of basic human needs and physical and pyschological injuries outlined in this here complaint.

## VIII. RELIEF SOUGHT:

114.    Plaintiff, Angel Rivera, seeks Injunctive Relief as requested with the Preliminary Injunction filed with this here complaint.

115.    Plaintiff, Angel Rivera, seeks declaratory Relief declaring that the Defendants violated his constitutional rights as well as declaring the unconstitutionality of long term solitary confinement in Pennsylvania.

116.    Plaintiff, Angel Rivera, seeks immediate release to the general population (NOT THE MANAGEMENT CONTROL UNIT (MCU) WHICH SEEMS TO BE WHERE THE DOC IS NOW LOOKIN TO SEND ALL OF IT LITIGATORS AS A RETALIATORY ACTION FOR LITIGATION) within an institution of his chossing.

117.    Plaintiff, Angel Rivera, seeks that an order be issued by this court bringing an end to the practice of both long term and Indefinite/prolonged solitary confinement in the state of pennsylvania.

118.    Plaintiff, Angel Rivera, seeks that an order be issued by this court bringing an end to the practice and use of the Restricted Release List (RRL), and Intensive Management Unit (IMU) in Pennsylvania.

119.    Plaintiff, Angel Rivera, seeks that a court ordered invesigation be opened up in these matters, and that the Defendants be held accountable for their actions by way of demotion and or termination of their duties.

120.    Plaintiff, Angel Rivera, seeks that the court order the establishment of an accountability policy that can and will hold all DOC personnel accountable for unethical acts commited against individuals within their care, as well as some form of supervisor liability clause.

121.    Plaintiff, Angel Rivera, seeks that he be awarded $200.00 in both Compensatory, and Punitive Damages each from each individual Defendant involved for everyday that he spent unlawfully and/or unconstitutionally on the Restricted Release List, and subjected to the excessive conditions of Indefinite/Prolonged Solitary Confinement.

122.    Plaintiff, Angel Rivera, seeks that he be awarded $50,000.00 in compensatory, and punitive damages for his established injuries, and for any injuries he may sustain in the future as a direct result and effect of the conditions the Defendants have and had subjected him

to.

123.    Plaintiff, Angel Rivera, seeks that he be awarded $75,000.00 in compensatory, and punitive damages from each individual defendant for their constitutional violations against him which has caused his pain and suffering.

124.    The Defendants as well as agents of the entity that they work for (Pennsylvania Department of Corrections) has a long history of underminding the seriousness, and ignoring the negative side effects caused by Indefinite/Prolonged Solitary Confinement, and subjecting people to these said condiions despite the serious risks posed. Therefore, as a result to punish, and deter them from continuing these same actions. I would like the court and or jury to award Plainitff $100,000.00 punitive damages from each individual defendant involved.

125.    Institutional Incentives of Plaintiff's choosing.

126.    Plaintiff, Angel Rivera, seeks Any other relief that this court or the jury deems necessary.

127.    Jury Trial Demanded.

## VIIII. VERIFICATION

I, Angel Rivera, Plaintiff in the above captioned matter hereby swears, declares, and affirms under the penalties of perjury codified at 28 U.S.C. § 1746 that the foregoing statements and facts set forth in this here § 1983 Civil Action complaint are true and correct to the best of my own personal knowledge, opinion, and belief.

11- 4- 24

/S/

ANGEL RIVERA #JW-1088
SCI-PHOENIX
1200 MOKYCHCIC DRIVE
COLLEGEVILLE, PA 19426